FILED

May 29 2026, 9:22 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Court of Appeals of Indiana

Devante Shakur Foster,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

May 29, 2026

Court of Appeals Case No.
25A-CR-325

Appeal from the Marion Superior Court

The Honorable Angela Dow Davis, Judge

Trial Court Cause No.
49D27-2112-F3-38841

---

**Opinion by Chief Judge Tavitas**
Judges Kenworthy and DeBoer concur.

**Tavitas, Chief Judge.**

## Case Summary

Following a three-day jury trial, Devante Foster was convicted of two counts of armed robbery, Level 3 felonies; kidnapping, a Level 3 felony; criminal confinement, a Level 3 felony; and theft, a Level 5 felony, arising from the armed robberies of two armored vehicles on December 15 and 16, 2021. Foster appeals. We affirm in part, reverse in part, and remand.[1]

## Issues

Foster raises four issues,[2] which we consolidate and restate as three dispositive issues:

   I.   Whether the State's remarks during closing argument constituted prosecutorial misconduct that resulted in fundamental error.

   II.  Whether the trial court violated Foster's constitutional rights to present a defense and to confront his accuser by limiting his cross-examination of a witness.

---

[1] We held oral argument in this matter on April 28, 2026, at the Indiana Historical Society. We thank the Indiana Historical Society for its hospitality and counsel for their presentations.

[2] We need not address Foster's sufficiency-of-the-evidence argument regarding the kidnapping conviction because we vacate that conviction on substantive double jeopardy grounds.

III. Whether Foster's convictions for theft, kidnapping, criminal confinement, and armed robbery violate the substantive bar to double jeopardy.

## Facts

[3] On December 15, 2021, Domonique Wilson and Tonya Stowers worked a two-person route for Loomis Armored Services in Indianapolis, making stops at a Kroger and a Dollar General. Wilson's assignment at the Dollar General was to service an ATM machine. After placing cash into the machine, Wilson exited the store carrying an empty courier bag.

[4] As Wilson walked back toward the armored vehicle, two armed men exited a white Chevrolet truck, which had positioned itself behind the Loomis vehicle. The men wore ski masks and gloves, ran toward Wilson, and pointed handguns at him. The two armed men grabbed Wilson's empty courier bag. They then seized Wilson by his hair, dragged him approximately ten feet to the rear of the armored vehicle, and demanded entry into the vehicle. Stowers activated the vehicle's alarm, and the two men fled in the white truck. A third masked man was spotted "peeking out from around that truck" and also fled the scene after hearing the active alarm. Tr. Vol. V p. 100.

[5] Wilson told responding officers that the attackers were black males between five feet ten inches and six feet tall. Wilson could not identify any of the perpetrators' faces because of the masks. The empty courier bag was later recovered approximately one mile away.

[6] On December 16, 2021, Troy Harper drove an armored truck for Brinks, Inc. to AutoZone to complete a cash drop. As Harper returned to the armored vehicle, two masked men exited a light red vehicle with no license plate and ran toward him with drawn handguns. The men pointed guns at Harper, pulled him to the back of the truck, and placed a gun in his face. The men took the key from around Harper's neck to access the vehicle. One of the men then forced Harper into the back of the armored truck.

[7] The vehicle had been left in "branch mode," a setting used when the truck is at the Brinks facility that unlocks the safe compartments, rather than "route mode," which locks the compartments during deliveries. Tr. Vol. IV p. 4. Because of this error, the men were able to open the safe compartment and remove multiple pre-packaged bags of currency. They fled in the red car, which was abandoned approximately one block away. Police later searched the car and found a license plate inside the trunk registered to Erica Moore,[3] which connected Darius Moore to the case. The total amount of currency taken was $843,599; law enforcement later recovered $17,720, leaving a net loss to Brinks of $825,879. Harper could not identify the perpetrators' faces because they wore ski masks.

---

[3] The record does not identify Erica Moore beyond her status as the registered owner of the license plate recovered from the trunk of the abandoned red car. No witness testified as to her relationship to Darius Moore or her knowledge of or involvement in the robberies. She was not charged in connection with either incident.

[8] In the days following the robberies, investigators observed in Kroger surveillance footage, taken on December 15, the white Chevrolet truck from the first robbery and a silver Mustang with a vanity license plate reading "BREDWIN" traveling together. Although the silver Mustang was not observed directly at the scenes of either robbery, investigators searched the Flock[4] database and located images showing the Mustang traveling with the white Chevrolet truck before and after the Loomis robbery on December 15 and traveling with the red abandoned car before and after the Brinks robbery on December 16. A search of Bureau of Motor Vehicles records confirmed that the Mustang was registered to Christie S. Foster, Devante Foster's mother.

[9] A police report from November 30, 2021, established that Foster was the driver of the Mustang approximately two weeks before the Loomis robbery. The physical descriptions provided by the victims matched Foster "in general." Tr. Vol. IV pp. 80, 87. Investigators began surveillance of multiple known addresses associated with Foster and Lonnie McGill,[5] including an address on Roseway Drive.

---

[4] The Flock Safety license plate reader system ("Flock") consists of stationary cameras positioned throughout a municipality that record vehicle movement at intersections. The system captures images of vehicles and their license plates and stores that data in a searchable database for thirty days. Law enforcement may search the database by date, time, location, vehicle make, model, and other identifying characteristics. Each image includes the camera's location, the date, and a timestamp.

[5] McGill, Foster's maternal half-brother and co-defendant, was charged jointly with Foster for his participation in both the December 15 and December 16, 2021 robberies and was tried alongside Foster before the same jury.

[10] On December 20, 2021, members of the IMPD SWAT team conducted a traffic stop of Foster on Interstate 69 as he returned from Michigan. Foster was driving a newly purchased Chevrolet Tahoe. The vehicle was searched pursuant to a search warrant. Inside the Tahoe, investigators found a cellphone; $36,760 in United States currency bundled with rubber bands and hair ties in a backpack; three gaming monitors in retail boxes; a box for a laptop computer; and purchase receipts from a Walmart in Coldwater, Michigan, including one receipt for items valued at over $700, paid in cash. Most significantly, the search yielded seven handwritten three-by-five index cards bearing the following operational instructions: "Know your spot," "Check for cameras," "Practice code," "Have a burner," "Do not use personal names," and "Do not move unless A or B say." Tr. Vol. IV pp. 233-35. One of the cards bore the word "AutoZone," the location of the December 16 Brinks robbery. *Id.* at 233.

[11] Later that same evening, investigators executed a search warrant at the Roseway Drive house. Inside the residence, investigators found $7,000 in cash inside a shoebox on a bed; a vase full of cash found in a third room; multiple firearms, including an FNH pistol; a blue face mask consistent with the masks worn by the robbery suspects; a handwritten receipt for the purchase of two FNH pistols bearing McGill's name; multiple cell phones in a box with Foster's driver's license; and newly purchased merchandise with receipts totaling approximately $2,000 to $3,000 from a mall in Columbus, Ohio.

[12]     The State eventually charged Foster, McGill, and Moore with six counts for the two armed robberies.  The State charged Foster as follows:

> **Count I, armed robbery, a Level 3 felony (I.C. 35-42-5-1(a)(2))**: On or about December 15, 2021, [Foster] did knowingly or intentionally take property, a courier bag from Dominique Wilson and/or Loomis Armored Services, by putting Dominique Wilson in fear and while [Foster] was armed with a handgun, deadly weapon[.]
>
> **Count II, kidnapping, a Level 3 felony (I.C. 35-42-3-2(a) and I.C. 35-42-3-2(b)(3) (A))**: On or about December 15, 2021, [Foster], while armed with a deadly weapon, to-wit: a handgun did knowingly remove Dominique Wilson by force or threat of force from one place, to-wit: the parking lot ground to another place, to-wit: the side of a truck[.]
>
> **Count III, criminal confinement, a Level 3 felony (I.C. 35-42-3-3(a) and I.C. 35-42-3-3(b)(3) (A))**: On or about December 15, 2021, [Foster] did knowingly confine Dominique Wilson without the consent of Dominique Wilson, said [Foster] being armed with a deadly weapon, to wit: a handgun[.]
>
> **Count IV, armed robbery, a Level 3 felony (I.C. 35-42-5-1(a)(2))**: On or about December 16, 2021, [Foster] did knowingly or intentionally take property, a handgun and/or U.S. Currency from Troy Harper and/or BRINKS, Inc., by putting Troy Harper in fear and while [Foster] was armed with a handgun, deadly weapon[.]
>
> **Count V, criminal confinement, a Level 3 felony (I.C. 35-42-3-3(a) and I.C. 35-42-3-3(b)(3) (A))**: On or about December 16, 2021, [Foster] did knowingly confine Troy Harper without the

consent of Troy Harper, said [Foster] being armed with a deadly weapon, to wit: a handgun[.]

**Count VI,[6] theft, a Level 5 felony (I.C. 35-43-4-2(a) and I.C. 35-43-4-2(a)(2) (A))**: On or about December 16, 2021, [Foster] did knowingly exert unauthorized control over the property of Brinks, Inc., to-wit: U.S. Currency; with the intent to deprive said person of any part of the use or value of the property, said property having a value in excess of fifty thousand dollars, to-wit: approximately $843,000.00.

Appellant's App. Vol. II pp. 47-48.

[13]     Moore pleaded guilty to armed robbery, a Level 3 felony, for his participation in the December 16, 2021 robbery.  In October 2024, the trial court conducted a three-day jury trial of Foster and McGill, and Moore testified as a State's witness.  During his testimony, the State asked Moore whether he admitted he was involved in the armed robbery with Foster and McGill.  Moore replied, "[in] the plea's factual basis, yes."  Tr. Vol. IV p. 248.  The State then asked, "And in that factual basis, you admitted that you aided Lonnie McGill and Devante Foster in that robbery that took place on that day, and that is what you are currently serving a sentence for; is that right?" and  Moore replied "[y]es." *Id*. at 248-49.

---

[6] In the charging information filed with the trial court, the State mistakenly labeled Count VI as Count VII. The State charged Foster with a total of six counts. *See* App. Vol. II p. 48.

[14] On cross-examination, Foster's counsel asked Moore: "Were you telling the truth when you said that Mr. Foster and Mr. McGill helped you with the robbery?" *Id*. at 249. Moore responded, "I can't say." *Id*. Foster's counsel followed up, "You can't say whether or not you told the truth?" Moore answered, "No." *Id*. Foster's counsel then asked Moore whether the plea "minimized [his] punishment." *Id.* Moore replied, "I didn't sign a testifying plea." *Id*. When Foster's counsel pressed Moore to clarify, yes or no, whether Foster was involved, Moore responded, "I'll perjure myself." *Id*. at 250.

[15] The trial court intervened and cautioned Moore: "You may not perjure yourself. So answer the questions that are asked of you." *Id*. The State then requested a bench conference. During that conference, the State expressed concern that Moore appeared to believe his guilty plea had conferred immunity from additional charges for any recantation at trial, which was incorrect; the State explained, "That's why I was worried before he keeps going." Tr. Vol. V p. 2. Foster's counsel responded, "I don't know how I can effectively represent Mr. Foster. Does [Moore] need a lawyer?" *Id.* The trial court declined to appoint counsel for Moore on the ground that Moore had not requested representation and instructed Foster's counsel: "He said he could not answer you without perjuring himself. You need to ask a different question. You may not elicit perjury from a witness." *Id.*

[16] After the bench conference, Foster's counsel abandoned the cross-examination regarding Moore's knowledge of Foster's participation in the robbery. Foster's counsel asked Moore how much money he took in the robbery; Moore

answered, "I'm not for sure." *Id.* Foster's counsel then asked whether Moore could share any other details about either the December 15 or December 16 robbery. Moore responded, "No." *Id.*

[17] The State also presented the testimony of a cell site location data analyst who analyzed call detail records for phones associated with Foster and McGill. On December 15, 2021, Foster's phone connected to a tower covering the Roseway Drive address in the overnight hours before the Loomis robbery; received a call from McGill at 9:35 a.m.; placed a call to Moore's number eight minutes before the robbery; and returned to the same tower and sector covering Roseway Drive approximately twenty minutes after the robbery. On December 16, 2021, Foster's phone placed a call to Moore's number at 5:51 a.m. from towers covering the Roseway Drive area; connected to towers covering the AutoZone corridor on East Washington Street in the period surrounding the 11:07 a.m. Brinks robbery; and returned to the same Roseway Drive tower and sector approximately twenty-five minutes after the robbery. The analyst also presented animated video displays mapping the movement of both phones through Indianapolis on both days.

[18] In closing argument, the State characterized Moore's testimony as identifying Foster as a participant in the robbery, and Foster did not object. In rebuttal, the State made two additional statements at issue on appeal. First, addressing defense counsel's assertion that Foster was five feet six inches tall, the State argued that Foster's driver's license listed his height as five feet eight inches and stated that defense counsel's earlier representation that Foster was five feet six

inches tall was "a lie." Tr. Vol. V p. 113. Second, the State again asserted that Moore testified that Foster was a participant in the robbery. Foster did not object to either statement.

[19] On October 24, 2024, the jury found Foster guilty as charged. On January 16, 2025, the trial court held a sentencing hearing. At sentencing, the trial court *sua sponte* vacated Foster's conviction for Count III, criminal confinement, a Level 3 felony, arising from the confinement of Wilson on December 15, 2021, finding that it "merge[d]" with the kidnapping conviction. Tr. Vol. V pp. 181, 197. The trial court entered judgments of conviction on the five remaining counts and sentenced Foster to an aggregate of forty-six years, with thirty-six years executed in the Indiana Department of Correction ("DOC") and ten years suspended to probation.[7] Foster now appeals.

---

[7] The trial court sentenced Foster as follows:

| Count | Charge | Sentence | Consecutive To |
|---|---|---|---|
| I | Armed robbery, a Level 3 felony | Ten years<br>*Nine years executed at DOC; one year suspended to probation* | |
| II | Kidnapping, a Level 3 felony | Ten years<br>*Fully executed at DOC* | Count I |
| IV | Armed robbery, a Level 3 felony | Fifteen years<br>*Twelve years executed at DOC; three years suspended to probation* | Count II |
| V | Criminal confinement, a Level 3 felony | Five years<br>*Fully executed at DOC* | Count IV |
| VI | Theft, a Level 5 felony | Six years<br>*Fully suspended to probation* | Count V |
| **Aggregate Sentence** | **Forty-six years: thirty-six years executed at DOC; ten years suspended to probation** | | |

## Discussion and Decision

### I.  The State's remarks during closing argument did not result in fundamental error.

[20]  Foster argues that the State committed prosecutorial misconduct during closing arguments in two respects: (1) the State told the jury that Foster's counsel lied about Foster's height; and (2) the State mischaracterized Moore's testimony by telling the jury that Moore directly identified Foster as a participant in the robberies.

[21]  If a claim of prosecutorial misconduct is properly preserved for appeal, "we determine '(1) whether misconduct occurred, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected otherwise.'" *Konkle v. State*, 253 N.E.3d 1068 (Ind. 2025) (quoting *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014)).[8]  "To preserve the misconduct claim for appeal, the defendant must object at the time the alleged misconduct occurs." *Id*. at 1077. Foster did not object to these remarks at trial, which results in waiver of the

---

App. Vol. II pp. 39-42; Tr. Vol. V pp. 198-99.  The trial court also ordered restitution of $776,000, joint and several with McGill.

[8] *Konkle* abrogated *Ryan* and several other cases only to the extent that those cases held that, even if a timely objection was overruled, a claim of prosecutorial misconduct was waived unless the defendant also requested that the jury be admonished and moved for a mistrial. *Konkle*, 253 N.E.3d at 1080-82.  *Konkle* held that only an objection is required to preserve a claim of prosecutorial misconduct and left undisturbed the other parts of the *Ryan* opinion and even cited it on other grounds.

issue on appeal. *See id.* at 1081. Foster must, therefore, show that the alleged prosecutorial misconduct constituted fundamental error.

[22] "Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to make a fair trial impossible." *Ryan*, 9 N.E.3d at 668. The defendant must show that the alleged errors "(a) constitute clearly blatant violations of basic and elementary principles of due process and (b) present an undeniable and substantial potential for harm." *Id.* Fundamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial errors that otherwise would have been procedurally barred, "not to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fail to preserve an error." *Id.*

### A. The Deputy Prosecutor's misconduct does not amount to fundamental error.

[23] During rebuttal closing argument, the prosecutor made a comment regarding Foster's height and stated: "[Foster's counsel] stood up and said [his] client is 5′6″. I'm going to draw your attention to Devante Foster's driver's license wherein it lists him as 5′8″. So that was a lie." Tr. Vol. V p. 113. Foster's counsel had earlier stated that Foster's height was five feet six inches.

[24] Foster argues that the Indiana Rules of Professional Conduct require lawyers to "demonstrate respect for the legal system and for those who serve it, including judges, other lawyers, and public officials." Appellant's Br. p. 14. Foster also

argues that the statement exceeded what the Supreme Court condemned in *Splunge v. State*, 641 N.E.2d 628, 630 (Ind. 1994). Foster further contends that the statement about Foster's height had no relevance to the question of Foster's participation in the robbery. The State conceded that Deputy Prosecutor, Brandon Carothers, committed misconduct when he remarked that Foster's counsel had lied to the jury about Foster's height. Appellee's Br. p. 18. The State contends, however, that the misconduct did not rise to the level of fundamental error for two reasons. First, the evidence of Foster's guilt was substantial and independent of the remark. Second, any prejudice caused by the remark was cured by the trial court's instruction to the jury that statements made by the Deputy Prosecutor are not evidence.

[25] Although the Deputy Prosecutor committed prosecutorial misconduct, this isolated instance of misconduct does not constitute fundamental error. We cannot say that the remark was so prejudicial to the rights of the defendant "as to make a fair trial impossible." *Ryan*, 9 N.E.3d at 668. The remark was made during closing argument at the close of trial. Moreover, the trial court instructed the jury that closing arguments are not evidence, and substantial evidence supported the convictions. The remark, therefore, did not violate the basic principles of due process or cause Foster substantial harm. Accordingly, we find no fundamental error.

## B. The State did not mischaracterize Moore's testimony.

[26] In its closing argument, Deputy Prosecutor Stewart Wahle asserted that "Darius Moore came in here and he told you [he] was the third man on that

day." Tr. Vol. V pp. 102-03. In rebuttal, Deputy Prosecutor Wahle further asserted: "It's his testimony that it's not a situation where it's two other people. It was him, and all of the evidence, all of the evidence that clearly points only to them backs up what he is telling you. He's the third co-conspirator. These are the other two co-conspirators." *Id*. at 117. Foster did not object to any statements, which were based on Moore's admission that he had "aided Lonnie McGill and Devante Foster in that robbery that took place on that day, and that is what [he is] currently serving a sentence for[.]" Tr. Vol. IV p. 248-49.

[27] Foster argues that Moore's testimony did not concern the underlying facts of the robbery because the State questioned Moore only about his guilty plea and the factual basis he admitted to, not the events of the December 16 robbery itself. Foster contends that the prosecutor's closing argument, thus, transformed Moore's testimony about a guilty plea factual basis into direct eyewitness testimony about the robbery. According to Foster, this is a material distinction because direct testimony from a participant in the crime identifying Foster as another participant would have been the only direct evidence of Foster's guilt.

[28] According to the State, Moore testified that he pleaded guilty to the December 16th armed robbery and, when he pleaded guilty, he admitted that he aided Foster and McGill in committing that robbery. The State argues that, based on this testimony and the other evidence presented at trial, Moore, Foster, and McGill were the three men involved in the nearly identical armed robberies that occurred on December 15 and 16, 2021. The State contends that the

prosecutor's statements constituted a permissible discussion of the evidence and reasonable inferences drawn therefrom.

[29] The question before us is whether the State's characterization of Moore's testimony was a reasonable inference from the evidence admitted at trial or a material misstatement of fact constituting prosecutorial misconduct. During Moore's testimony, the State asked, "And in that factual basis, you admitted that you aided Lonnie McGill and Devante Foster in that robbery that took place on that day, and that is what you are currently serving a sentence for; is that right?" and Moore replied "[y]es." Tr. Vol. IV p. 248-49. The substance of Moore's testimony clearly indicated that he admitted, under oath, that he and Foster and McGill were involved in the December 16 robbery. We conclude, therefore, that the State did not materially mischaracterize Moore's testimony and did not commit prosecutorial misconduct, let alone fundamental error, by making the statements.

## II. The trial court did not violate Foster's constitutional rights to present a defense and to confront his accuser.

[30] Foster next argues that his constitutional rights to confront witnesses and to present a defense under Article 1, Section 13 of the Indiana Constitution and the Sixth and Fourteenth Amendments to the United States Constitution were violated because the trial court prohibited the defense from asking Moore further questions that might elicit perjury from Moore.

[31]   "Generally, '[t]rial courts have broad discretion to admit or exclude evidence,' and we review for abuse of that discretion." *Combs v. State*, 168 N.E.3d 985, 990 (Ind. 2021) (citing *Satterfield v. State*, 33 N.E.3d 344, 352 (Ind. 2015)). We will reverse only where the decision is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Clark v. State*, 994 N.E.2d 252, 259-60 (Ind. 2013). To the extent that the challenge involves a constitutional question, our review is *de novo*. *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015). We must first address the threshold issue of whether the record establishes the existence of a constitutional question. *See Borosh v. State*, 336 N.E.2d 409, 413 (Ind. Ct. App. 1975) ("[W]hen a constitutionally impermissible denial of cross-examination is asserted in a criminal cause before this court, our first inquiry must be whether the record establishes the existence of a constitutional issue.").

[32]   When a constitutional error occurs in restricting cross-examination, it does not automatically warrant reversal, and we must determine whether the error was harmless. *McCarthy v. State*, 749 N.E.2d 528, 534 (Ind. 2001). "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). "Whether the trial court's error is harmless depends on several factors, including: [t]he importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of

the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.* at 535.

[33] At trial, the Deputy Prosecutor asked Moore: "And in that factual basis, you admitted that you aided Lonnie McGill and Devante Foster in that robbery that took place on that day, and that is what you are currently serving a sentence for; is that right?" Tr. Vol. IV pp. 248-49. Moore replied, "[y]es." *Id.* Later, during cross-examination, Moore refused to answer clarifying questions because he did not want to commit perjury. The trial court instructed Foster's counsel to not ask questions that would elicit perjury from Moore. Foster argues that his defense was "based on identity, so the trial court's decision to prevent him from countering evidence . . . was a substantial impairment on his right to present a defense." Appellant's Br. p. 20.

## A. U.S. Constitution Sixth Amendment

[34] The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "This right of confrontation is made obligatory on the states by the Fourteenth Amendment." *State v. Owings*, 622 N.E.2d 948, 950 (Ind. 1993). The Sixth Amendment has not "been interpreted literally to guarantee a criminal defendant all rights of confrontation at every trial for every witness." *Id.* The right to confront witnesses and present a defense "is subject to reasonable limitations placed at the discretion of the trial judge." *McQuay v. State*, 566 N.E.2d 542, 543 (Ind. 1991).

[35] Here, the trial court properly exercised its discretion in limiting Foster's cross-examination of Moore. The trial court allowed the State to question Moore regarding his involvement in the December 16, 2021 robbery. During cross-examination, Moore stated, "I'll perjure myself," when asked questions regarding the factual basis he admitted to when pleading guilty. Tr. Vol. IV p. 250. The trial court then cautioned Moore against committing perjury and instructed Foster's counsel to ask a different question. The trial court only intervened to prevent the knowing introduction of perjured testimony. Moore admitted during direct examination that he pleaded guilty to the December 16 robbery. Thus, the practical effect of limiting Foster's rights to confront Moore was minimal.

[36] Moore's testimony was, moreover, not the only evidence connecting Foster to the robberies. The State presented substantial independent evidence linking Foster to the crimes, including the getaway vehicle registered to Foster's mother, a large sum of cash recovered from Foster's vehicle, and cell phone data placing Foster near the robbery locations on both December 15 and December 16, 2021. Even assuming that the trial court's limitation of Foster's cross-examination of Moore constituted error, that error was harmless beyond a reasonable doubt. *See McCarthy*, 749 N.E.2d at 535-36 (holding error harmless where the prosecution's case was otherwise strong, independent corroborating evidence existed, and cross-examination of the witness had been thorough and unlimited on all other matters). Thus, Foster's Sixth Amendment rights were not violated.

## B. Indiana Constitution Article 1, Section 13

[37] Article 1, Section 13 of the Indiana Constitution provides that "in all criminal prosecutions, the accused shall have the right to . . . meet the witnesses face to face . . . ." Although Indiana courts have determined that cross-examination is the primary interest secured by Article 1, Section 13, the rights guaranteed by Article 1, Section 13 are not necessarily identical to those given by the Sixth Amendment. *Owings*, 622 N.E.2d at 950. Nonetheless, like the Sixth Amendment, Article I, Section 13 has not "been interpreted literally to guarantee a criminal defendant all rights of confrontation at every trial for every witness." *Id.*

[38] The analysis under Article 1, Section 13 of the Indiana Constitution yields the same result. Foster enjoyed the full panoply of his constitutional rights throughout the entirety of the trial proceedings. The trial court's limitation on Foster's cross-examination of Moore was confined to the isolated episode in which Moore expressly stated that he would perjure himself if the questioning continued. The limitation was, thus, narrowly tailored and reasonable under the circumstances, and the trial court acted well within its discretion. Foster's rights under Article 1, Section 13 of the Indiana Constitution were, therefore, not violated.

## III. Foster's convictions for theft, kidnapping, criminal confinement, and armed robbery violate substantive double jeopardy principles.

[39] Foster claims his convictions for: (A) Count IV, armed robbery, a Level 3 felony, and Count VI, theft, a Level 5 felony; (B) Count IV, armed robbery, a

Level 3 felony, and Count V, criminal confinement, a Level 3 felony; and (C) Count I, armed robbery, a Level 3 felony, and Count II, kidnapping, a Level 3 felony, constitute substantive double jeopardy.

[40] The State conceded in its appellate brief that Foster's convictions for armed robbery and theft "violate[d] the substantive bar to double jeopardy." Appellee's Br. p. 20. Later, during oral argument, the State conceded that Foster's convictions for armed robbery and criminal confinement similarly constitute substantive double jeopardy. The remaining issue before us, thus, is whether Foster's convictions for both armed robbery and kidnapping amount to substantive double jeopardy.

## A. Standard of Review

[41] Whether multiple convictions constitute double jeopardy is a question of law that we review de novo. *A.W. v. State*, 229 N.E.3d 1060, 1064 (Ind. 2024). Our Supreme Court has identified two types of double jeopardy: the first type occurs where "a single criminal act or transaction violates multiple statutes with common elements and harms one or more victims," and *Wadle* governs such claims. *Wadle v. State*, 151 N.E.3d 227 (Ind. 2020). The second type occurs when "a single criminal act or transaction violates a single statute but harms multiple victims," and *Powell* governs such claims. *Powell v. State*, 151 N.E.3d 256, 263 (Ind. 2020). The parties agree that *Wadle*, rather than *Powell*, governs because Foster's substantive double jeopardy claim challenges the trial court's authority to enter multiple judgments of conviction under multiple

criminal statutes, not the "charging of a single offense in several counts."[9] *Powell*, 151 N.E.3d at 263.

[42] Under the **first step** of the *Wadle* test, we ask whether "the language of either statute clearly permits multiple punishment, whether expressly or by unmistakable implication." *Wadle*, 151 N.E.3d 227 at 253.

[43] "Under *Wadle* **step two**, we determine whether the two offenses for which the defendant was convicted constitute 'included' offenses." *Wadle*, 151 N.E.3d at 248. Included offenses come in two varieties: (1) "inherently" included offenses; and (2) offenses that are included "as charged" or "factually included." *A.W.*, 229 N.E.3d at 1067. As explained in *Wadle*, 151 N.E.3d at 248, an offense is inherently included if it meets the definition of an included offense under Indiana Code Section 35-31.5-2-168. This statute provides that an "[i]ncluded offense" means an offense that:

> (1) is established by proof of the same material elements or less than all the material elements required to establish the commission of the offense charged;
>
> (2) consists of an attempt to commit the offense charged or an offense otherwise included therein; or
>
> (3) differs from the offense charged only in the respect that a less serious harm or risk of harm to the same person, property,

---

[9] Our Supreme Court recently decided *Moyers v. State*, 277 N.E.3d 33 (Ind. 2026), which established a threshold framework for determining whether *Powell* or *Wadle* governs a substantive double jeopardy claim.

or public interest, or a lesser kind of culpability, is required to establish its commission.

I.C. § 35-31.5-2-168.

[44] In contrast to inherently included offenses, "[o]ffenses are included as charged when 'the charging instrument alleges that the means used to commit the crime charged include all of the elements of the alleged lesser included offense.'" *A.W.*, 229 N.E.3d at 1067. In *A.W.*, our Supreme Court clarified *Wadle*'s "perhaps misunderstood directions, while adding a modification at Step 2." Specifically, *A.W.* held that:

> [W]here ambiguities exist in a charging instrument about whether one offense is factually included in another, courts must construe those ambiguities in the defendant's favor, and thus find a presumptive double jeopardy violation at Step 2. In this event, the State can later rebut this presumption at Step 3.

*Id.* at 1069.

[45] "Under *Wadle* **step three**, we examine the facts underlying the offenses, 'as presented in the charging instrument and as adduced at trial.'" *Wadle*, 151 N.E.3d at 249. "'Based on this information, a court must ask whether the defendant's actions were so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction.'" *Id*. "If the defendant's acts constitute a single transaction, the multiple convictions constitute double jeopardy." *Id*. At this step, the State bears the burden of rebutting the presumptive double jeopardy violation by using the facts presented

at trial to demonstrate a "distinction between what would otherwise be two of the 'same' offenses." *A.W.*, 229 N.E.3d at 1071 (citing *Wadle*, 151 N.E.3d at 249 n.27).

## B. The convictions for Armed Robbery and Kidnapping violate substantive double jeopardy principles.

[46] Foster contends that his convictions for armed robbery and kidnapping arising from the December 15 Loomis robbery constitute a substantive double jeopardy violation. The State argues that no double jeopardy violation occurred because Foster completed the armed robbery before he committed the kidnapping. We agree with Foster.

[47] **Armed robbery** is governed by Indiana Code Section 35-42-5-1(a) and provides:

> [A] person who knowingly or intentionally takes property from another person or from the presence of another person:
>
> > (1) by using or threatening the use of force on any person; or
> >
> > (2) by putting any person in fear;
>
> commits robbery, a Level 5 felony. However, the offense is a Level 3 felony if it is committed while armed with a deadly weapon or results in bodily injury to any person other than a defendant . . . .

**Kidnapping** is governed by Indiana Code Section 35-42-3-2(a) and provides:

(a) A person who knowingly or intentionally removes another person, by fraud, enticement, force, or threat of force, from one place to another commits kidnapping. Except as provided in subsection (b), the offense of kidnapping is a Level 6 felony.

(b) The offense described in subsection (a) is . . . a Level 3 felony if it:

(A) is committed while armed with a deadly weapon;

[48] Applying the three-step *Wadle* test, we **first** determine whether the statutes at issue clearly permit "multiple punishment, whether expressly or by unmistakable implication[.]" *Wadle*, 151 N.E.3d at 253. The parties agree that neither the armed robbery nor the kidnapping statute clearly permits multiple punishment, either expressly or by unmistakable implication. We, therefore, proceed to the second step of the *Wadle* test.

[49] At *Wadle* **Step 2**, Foster does not argue that kidnapping is "an inherently included offense of armed robbery" but contends that it was factually included as charged. Appellant's Br. p. 31. Here, Foster was charged as follows:

> **Count I, armed robbery, a Level 3 felony under I.C. 35-42-5-1(a)(2):** On or about December 15, 2021, [Foster] did knowingly or intentionally take property, a courier bag from Dominique Wilson and/or Loomis Armored Services, by putting Dominique Wilson in fear and while [Foster] was armed with a handgun, deadly weapon[.]

**Count II, kidnapping, a Level 3 felony under I.C. 35-42-3-2(a) and I.C. 35-42-3-2(b)(3)(A):** On or about December 15, 2021, [Foster], while armed with a deadly weapon, to-wit: a handgun did knowingly remove Dominique Wilson by force or threat of force from one place, to-wit: the parking lot ground to another place, to-wit: the side of a truck[.]

Appellant's App. Vol. II p. 47-48. Foster contends that the charging information is ambiguous as to whether the kidnapping was the means used to commit the robbery. Because of this ambiguity in the charging information, under *A.W.*, it must be construed in Foster's favor and we proceed to the *Wadle* Step 3 analysis. The State conceded in its appellate brief regarding Step 2 that "the charging information is ambiguous as to whether the kidnapping offense is an included offense of the armed robbery offense." Appellee's Br. p. 34. Accordingly, we proceed to Step 3.[10]

[50] At *Wadle* **Step 3**, Foster argues that the facts confirm that the kidnapping was the means used to effectuate the robbery, making the two offenses a single continuous transaction. In his reply brief, Foster further argues that the taking of the courier bag and the forced movement of Wilson toward the armored vehicle "should not be viewed in isolation" because all actions shared the same

---

[10] We note that the charge of kidnapping contains a distinct element, asportation, i.e., the transportation of a person from one place to another, that is neither required by nor included in the charging information for armed robbery, a Level 3 felony. The State, however, did not raise this distinction at the *Wadle* Step 2 analysis and, instead, proceeded directly to a *Wadle* Step 3 analysis.

purpose, occurred in the same location, and were compressed in time." Appellant's Reply Br. p. 10.

[51] The State argues that no single, continuous crime occurred because Foster "completed the elements of armed robbery before he committed the kidnapping" by pointing a gun at the victim while taking the courier bag. Appellee's Br. p. 35. Nothing but the courier's bag was taken during the December 15 Loomis robbery. The State contends that Foster committed kidnapping by grabbing Wilson and forcing him from one side of the truck to the other and that the robbery and kidnapping were committed sequentially. *Id.*

[52] Foster used a gun to move Wilson to perpetrate the robbery. *See* State's Ex. 4(a) at 12:00-12:42. The video evidence depicts that all actions occurred in less than a minute in the same location, which was the parking lot where the Loomis armored vehicle was parked. *Id.* There was no discernible break between the armed robbery and the kidnapping; the actions were continuous and, thus, constituted a single transaction. Accordingly, we conclude that the State failed to meet its "burden of rebutting the presumptive double jeopardy violation." *A.W.*, 229 N.E.3d at 1071. *See e.g.*, *Jones v. State*, 159 N.E.3d 55, 66-67 (Ind. Ct. App. 2020) (holding that convictions for both criminal confinement and kidnapping violate double jeopardy because defendant's actions constitute a single continuous transaction), *trans. denied*. As a result, we remand with instructions to vacate the kidnapping conviction and the sentence entered thereon.

## Conclusion

The State's closing argument did not constitute fundamental error warranting reversal of Foster's convictions for two counts of armed robbery. The trial court did not violate Foster's constitutional rights under the Sixth Amendment's Confrontation Clause and Indiana Constitution Article 1, Section 13 to present a defense and to confront witnesses by limiting his cross-examination of Moore. We conclude, however, that Foster's convictions for theft, kidnapping, and criminal confinement violate the substantive bar to double jeopardy and must, therefore, be vacated. Accordingly, we affirm in part, reverse in part, and remand with instructions for the trial court to vacate Foster's convictions for theft, kidnapping, and criminal confinement, and to resentence Foster accordingly.

Affirmed in part, reversed in part, and remanded.

Kenworthy, J., and DeBoer, J., concur.

ATTORNEY FOR APPELLANT

Sarah Medlin
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Andrew M. Sweet
Deputy Attorney General
Indianapolis, Indiana